1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

9
10

ANGEL L. GOMEZ,

11                Plaintiff,

12        v.

13  CAROLYN W. COLVIN,
    Acting Commissioner of Social Security,
14

15                Defendant.

Case No.  1:15-cv-00647-SKO

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

(Doc. 1)

16
17  _____/
18
19
20                        **I.  INTRODUCTION**

21        Plaintiff Angel L. Gomez ("Plaintiff") seeks judicial review of a final decision of the

22  Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application

23  for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act.  42 U.S.C.

24  § 405(g).   The matter is currently before the Court on the parties' briefs, which were submitted,

25  without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

26                        **II. BACKGROUND**

27        Plaintiff  was  born  on  March  15,  1959.    (Administrative  Record  ("AR")  39.)    On

28
    _____
    [1]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 6, 8.)

November 28, 2011, Plaintiff filed a claim for DIB, alleging he became disabled on November 7, 2011, due to a "mental condition," post-traumatic stress disorder (PTSD), and high blood pressure. (AR 231.)  Plaintiff also claims disability due to back pain as a result of a lumbar fusion (AR 287) and pain in lower extremities (AR 287, 295).   Plaintiff is a high school graduate, attended two years of college, but did not earn a degree.  (AR 39, 232.)  Plaintiff has completed specialized job training.  (AR 232.)  Plaintiff was in the U.S. Army from 1978 to 1982 and was stationed in Turkey.  (AR 20.)  From 1995 to November 7, 2011, Plaintiff was an Electronic Technician for the U.S Postal Service.  (AR 248.)

**A.     Relevant Medical Evidence[2]**

**1.     Mental**

In 2002, Plaintiff presented to the VA Hospital Evaluation Unit for assistance with work-related stress and harassment.  (AR 417.)  Plaintiff stated that since 1998, he had filed ten (10) complaints with the Equal Employment Opportunity Commission ("EEOC").   (AR 419.)  Plaintiff reported depressed and anxious mood, and memory and concentration problems.  (AR 417.)   Plaintiff stated that he had recently cut back on heavy drinking, and was encouraged to cease alcohol consumption altogether.  (AR 419.)

In 2003, Plaintiff presented to the Evaluation Unit "to talk with someone about his problems at work."  (AR 416.)  He reported that, after drinking beer one night after work, he "made a phone call to someone and said something negative about [his] supervisor," and "[m]ust now go to court in front of the Postal Inspector to answer to charges."  (AR 416.)

In 2006, Plaintiff presented to the VA Emergency Department complaining that he was feeling "increasingly stressed, depressed, useless over the past week regarding work . . . . "  (AR 415.)  Plaintiff reported "depressed mood, inability to concentrate, forgetfulness, performance anxiety about his work, which he has done well for years, and periods of time when he drives and doesn't remember how he got to where he is going."  (AR 413.)  Plaintiff also complained of "some PTSD-type sx of nightmares of military experience in Turkey, from which he wakes in a

---

[2] As Plaintiff's assertion of error is limited to the ALJ's consideration of his alleged PTSD and chronic pain syndrome diagnoses, only evidence relevant to these arguments is set forth below.

cold-sweat with racing heart." (AR 413.) Plaintiff reported feeling "that things are building up and he often fantasizes about punching the manager out, or buying an M16 to shoot," but stated that "he never hurt any one [sic] and doesn't feel he is at all close to doing so." (AR 413.) Plaintiff stated that was on 3-day leave from work "to avoid the tension." (AR 413.) Plaintiff reported that he has been abstinent from alcohol for over a year. (AR 413.)

On May 26, 2009, Plaintiff spoke with a mental health physician regarding stress and excessive alcohol intake. (AR 412.) Plaintiff denied suicidal ideation and depression, but reported that he was "angry" and that the "suffers from nightmares from military experiences he endured while on active duty in Turkey in 1982." (AR 412.) Plaintiff stated that he "seeks relief from stress and anger by drinking 6-12 beers most nights." (AR 412.) The medical health physician noted that Plaintiff "appears to be suffering from symptoms of PTSD with alcohol dependence." (AR 412.)

That next day, May 27, 2009, Plaintiff presented to the VA Hospital Evaluation Unit complaining of sleep disturbances. (AR 409-11.) Plaintiff reported to Roy Raroque, M.D., that his nightmares were "getting worse, not sure why," and that the dreams change but the themes are about the military. (AR 409.) Plaintiff denied having been in combat. (AR 409.) Plaintiff stated that he had dreamed (1) that someone with whom he had gone on a drill pointed an M16, pointed and him, and asked "Do you want to die?," (2) that he saw from a distance "a Turkish guy shoot any [sic] Turkish person in the head" and that he "recalls pieces of brain," (3) an "alert system at barracks ground off announcing the arrival of an injured person," and (4) during a 15-mile run seeing "a soldier's pant leg w/ maggots and discovers more under the pant leg." (AR 409.) Plaintiff reported that the "work issues resolved which was on-going 'for ten years,'" and that "[w]ork has been great now." (AR 409.)

On August 17, 2009, Plaintiff was seen by treating physician Sreekanth Chava, M.D., at Kaiser Permanente, complaining of "anxiety including excessive worry, restlessness, and 'stressed out' depression including depressed mood, irritability, decreased energy and decreased concentration." (AR 451.) Plaintiff "denied any consistent depressive or anxiety symptoms," and Dr. Chava observed that "[t]hese depressive and anxiety symptoms are reactive to his stressors."

(AR 451.)  Plaintiff reported that he had been drinking daily at least 5-6 beers per day in the last two weeks.  (AR 451.)   Dr. Chava's assessment was that Plaintiff "presents with increasing difficulties with sleep, anxiety and depression in the setting of alcohol use and relational difficulties."  (AR 453.)  Dr. Chava diagnosed Plaintiff with adjustment disorder with anxious depressed mood and alcohol abuse and started him on 10 mg. Prozac.  (AR 450.)

In October and December 2009, Dr. Chava saw Plaintiff during follow-up appointments, at which Plaintiff reported "significant improvement in his anxiety, depression, irritability, sleep initiation difficulties, job performance, and relational difficulties" (AR 456, 459), that he was "using 'ignoring' and distractions as coping strategies to avoid negative interactions at work," and that he was maintaining sobriety.  (AR 456, 460.)  Plaintiff noted that the Prozac was "very helpful."  (AR 456, 460.)

On March 22, 2010, Plaintiff was referred by the VA Emergency Room to the Mental Health Clinic, where he reported having "mood swings on a daily basis over the last two weeks," and feeling "irritable, angry, anxious, depressed, and 'out of control.'"  (AR 404.)  Plaintiff also reported experiencing "unpredictable crying episodes within this time period . . . .  "  (AR 404.)  Plaintiff stated that he "[f]inds himself isolating in his house and tells his daughter and son-in-law to leave the house because he wants to 'hide' (daughter and son-in-law live with him)."  (AR 404.)  Plaintiff also reported he had been "sleeping poorly due to nightmares of his experiences in the Army," and described having "weekly recurrent memories of traumatic events like witnessing fellow servicemen 'brains blown out.'"  (AR 405.)  Plaintiff denied ever being in combat, but stated that his military service "was 'just like combat' due to having 'marshal law' declared on multiple occasions while he was in Turkey."  (AR 405.)  Plaintiff reported that he used alcohol to cope with his negative memories of Turkey but has been unable to drink alcohol since August 2009 "because his body no longer tolerates alcohol," and indicated that "[s]ince he can no longer drink alcohol he can no longer cope with his recurrent memories of Turkey."  (AR 405.)  Plaintiff stated that he stopped taking Prozac just prior to back surgery on March 10, 2010, as instructed by his surgeon, and was kept off of the medication during his recovery.  (AR 405.)  Plaintiff reported that he "started to feel his mood changing" upon returning home from the

hospital and resumed taking Prozac "a little over one week ago," but that he did not feel that the medication was working as effectively as it once was before surgery." (AR 405.)   Plaintiff's assessment was "altered mood related to anxiety, anger and frustration over PTSD symptoms and his inability to control his labile mood." (AR 405.)

Plaintiff was seen by VA psychiatrist Dr. Raroque, for a medication evaluation on March 24, 2010. (AR 403.) Dr. Raroque recommended that Plainiff increase his Prozac dosage from 10 mg. to 20 mg. (AR 403.) On March 29, 2010, Plaintiff presented to the VA Mental Health Clinic for an initial intake assessment. (AR 399.)   Plaintiff was currently taking 20mg. Prozac. (AR 400.)   Plaintiff "denie[d] depression," but requested help with his "mood swings and ugly dreams." (AR 399.)   Plaintiff described his mood symptoms as "irritable and anger easily," "feels like he is still in the military sometimes…like he needs to get in his uniform, get his rifle and function as if he was in the military," and having a "[l]ow tolerance to people pushing issues on him." (AR 400.)   Plaintiff stated that his "[c]oncentration is normally good unless he goes through 'Episodes.'" (AR 400.)   Plaintiff reported that he would "walk away when he gets 'Pissed off in the middle of the conversation.'" (AR 400.)

On May 14, 2010, Plaintiff presented at the VA Psychiatry Resident Outpatient clinic and was seen by Ani Tokat, M.D.  Dr. Tokat observed Plaintiff to initially appear "irritable, with a very short fuse as evident in his abrupt answers," but eventually "really relaxed." (AR 398.) Plaintiff "endorses a lot of irritability and anger management issues since his time in the military, specifically while was in Turkey," and "endorses PTSD sx revolving around multiple life threatening experiences to include being run after with daggers, being betrayed by someone from his own troop who pointed an M16 at his head, during which time he vividly remembers the thought that he was going to get killed." (AR 398.)   Plaintiff reported waking up with panic attacks from his nightmares and trying to kill his wife in her sleep during one such episode. (AR 398.)   Plaintiff "endorsed flashbacks, hypervigilence, and exaggerated startled response" and denied "depressive features."    (AR 398.)   Plaintiff admitted to "self-medicating with alcohol for many years, consisting of at least 12/pack beer daily," but stated that he had not been drinking for one year.    (AR 398.)   Plaintiff reported his PTSD symptoms "have been improving" since

starting Prozac, as well as his relationship with his daughter and son-in-law, with whom he lived. (AR 398.)  Plaintiff admitted to having a "short fuse," but is able to "control his impulsive behavior." (AR 398.)  Dr. Tokat recommended that Plaintiff increase his Prozac dosage from 20 mg to 40 mg.  (AR 398.)

On June 29, 2010, Plaintiff called the VA National Suicide Prevention Hotline in a "very agitated" state, stating that he is "very angry with his boss" who he claimed is racist.  (AR 395.) Plaintiff stated that "he has been having problems at work with supervisors ever since he transferred to [F]resno in 1998." (AR 395.)  Plaintiff denied feeling suicidal and homicidal.  (AR 395.)  During a follow-up phone call that same day, Plaintiff "immediately launched into a tirade about how he was being mistreated at work and how he has been ridiculed and harassed by employees as well as his boss." (AR 396.)  Plaintiff stated that he was "highly stressed and angry about how he has been treated" and that he "doesn't see an end to the abuse or any resources on how to get relief from the situation."  (AR 396.)  Plaintiff stated that when he began taking Prozac, it had a "positive effect," and that he quit drinking alcohol afterward for "symptom management."  (AR 396.)   Plaintiff stated that he is "going to quit taking all his pills now because he is so upset and angry, that nothing seems to help anymore."  (AR 396.)  Plaintiff denied suicidal ideation, plan or intent, but stated "I am just so frustrated.  I don't know where to turn anymore." (AR 396.)

On July 14, 2010, Plaintiff was seen by VA physician Gilbert D'Souza, M.D., who observed that Plaintiff is "experiencing significant work related stressors as well as anger issues." (AR 394.)  Plaintiff reported that his work environment is "very hostile and intimidating," and reported that "[c]o workers frequently use profanity, threats, and often police were called to resolve immediate issues." (AR 393.)  Plaintiff stated that "he does not get along with another older adult co-worker" and that, after an argument with the co-worker, Plaintiff "wanted to beat the crap out of him."  (AR 393.)  Plaintiff reported that he had reported this and other past incidents to his supervisor without resolution. (AR 393.)  Plaintiff stated that "at times [he] feels like taking matters into his own hands but at the same time he is aware of the consequences." Plaintiff reported that when these incidents occur he leaves the work place, but that he has no sick

leave or other time off left.  (AR 393.)   Dr. D'Souza noted "[e]xposure to traumatic events during military service and current re-experience symptoms."  He stated that "PTSD symptoms may contribute to current anger and some of the difficulties he is experiencing at work."  (AR 394.)   Dr. D'Souza "[s]trongly recommended" that Plaintiff resume taking Prozac, which Plaintiff reported that he stopped taking about a month prior because he did "not want to mess [his] head ."  (AR 394.)  Plaintiff denied depression.  (AR 393.)

On August 26, 2010, Plaintiff was seen by Dr. D'Souza after having called the VA National Suicide Prevention Hotline requesting an appointment in the mental health clinic.  (AR 363-65.)  Plaintiff complained that he was recently involved in a verbal confrontation with a coworker that "escalated into a shouting match" when the coworker made some derogatory comments that "triggered anger outburst."  (AR 365.)  Plaintiff asked the coworker to "come out of the plant to settle the dispute," and, as a result, his supervisors counseled him and "accused him of making threats."  (AR 365.)  Plaintiff reported living alone, as he had asked his daughter to vacate.  (AR 365.)  Dr. D'Souza recommended a "trial of benzodiapine for calming effect during angry outbursts and a mood stabilizer as maintenance therapy," but Plaintiff "declined, not interested in meds."  (AR 366.)

On September 1, 2010, Plaintiff was seen by Dr. Tokat complaining of "memory, anger outbursts, and ringing in his ears."  (AR 362.)  Plaintiff reported that his nightmares "come and go, maybe once a month," and that he "continues to be hypervigilant and sleeps with a knife in bed."  (AR 362.)   Plaintiff stated that he discontinued Prozac because it caused "memory impairment."  (AR 362.)  Plaintiff stated that calling the Suicide Hotline "seems to help him, but emphasized that he's not interested in meds."  (AR 362.)   Dr. Tokat's impression was that Plaintiff suffered from "Post Traumatic Stress Disorder," that "Intermittent Explosive Disorder" was ruled out, and that Plaintiff had a history of "Alcohol Dependence [with] Sustained Full Remission."  (AR 362.)

On September 3, 2010, Plaintiff was seen by VA Clinical Psychologist Elizabeth McKee, M.D., "for an evaluation for the treatment of PTSD…after he completed a [Mental Health Clinic] interview and was diagnosed with PTSD."  (AR 354.)   Plaintiff reported that his "top three

treatment concerns" were "[m]ood swings, [f]lashbacks, and [i]irritability or anger," and that his current stressors were "[w]ork relationships" and "memory problems."  Specifically with respect to work problems, Plaintiff reported that "his anger has been difficult for him in terms of getting along with fellow employees."  (AR 354.)  Plaintiff maintained that he maintained his sobriety for over one year.  (AR 355.)  Plaintiff reported being "manhandled and threatened by Turkish soldiers who mistook him for a terrorist," but declined to elaborate on this and other experiences while in the military, as he became "increasingly agitated" talking about them.  (AR 355.) Plaintiff reports that he "now avoids weapons and other people" and "no longer experiences joy in his prior pastimes of fishing, reading, [and] drawing." (AR 355.)   Plaintiff stated that "his anger and agitation is a constant problem in work and interpersonal relationships," that he "breaks his own belongings after becoming frustrated," that he has "random thoughts of hurting and being verbally abusive to people ('whoever pisses me off')," and that he "recently broke off contact with his daughter as he has become afraid he may lose control with her." (AR 356.)   Dr. McKee indicates that his score on the "PTSD Checklist" and the "Mississippi Scale" quantitative measures are "consistent with a diagnosis of PTSD."  (AR 356-57.)     Dr. McKee's diagnostic impressions are that Plaintiff

> affirms processes consistent with those observed in PTSD.  He also reports significant trauma in which he feared for his life.  As he is reticent to discuss these experiences in detail, it is difficult to fully evaluate those specific experiences [sic] impact on him.  His scores on the measures for PTSD (PCL and MISS above) are higher than those normally observed in veterans with PTSD.  This may represent over reporting of symptoms motivated by a 'call for help' as he was agitated while answering the questionnaires and had made a call to the Suicide hotline previously in the day complaining of PTSD.  He also reports significant symptoms of depression, though he denies SI/HI, intent or plan.  Lastly, although he affirms significant risk factors for relapse, he asserts that he has maintained his sobriety for over a year.

(AR 359.)  Given Plaintiff's "reports of significant trauma and reported symptoms of PTSD," Dr. McKee referred Plaintiff to the PCT Coping Skills group to focus on treatment of PTSD."  (AR 359.)

On November 9, 2010, Plaintiff was seen by Dr. Chava at Kaiser presenting with a "relapse in his anxiety and depression."  (AR 462.)  Plaintiff reported that he "did well" with

resolution of his anxiety and depression with Prozac 40 mg daily.  (AR 463.)  Once he stopped

taking the medication, in August 2010, Plaintiff reported a "relapse in his depression and anxiety

in the last month or so," including having experienced an "anxiety episode at work." (AR 463.)

Plaintiff requested that he restart taking Prozac.  (AR 463.)  Plaintiff stated that he had been able

to refrain from using alcohol until a few weeks ago, when he had a "few episodes of alcohol use

to cope with his anxiety."   Plaintiff reported that he wished to "refrain from alcohol or other

substance abuse."  (AR 463.)  Dr. Chava restarted Plaintiff on 20 mg Prozac.  (AR 465.)   On

November 16, 2010, Dr. Chava wrote the United States Postal Service Occupational Health

Nurse Administrator and stated that Plaintiff

> is receiving psychiatric treatment at our Psychiatry Clinic.   I am providing
> medication management.   His diagnosis is Anxiety Disorder and Adjustment
> Disorder with anxiety and depression.   He was last seen by this provider on
> 11/9/10.   He was excused from work from 11/9/10 to 11/19/10 due to his medical
> condition. There are no side effects to his medications.   He can return to work
> without restrictions on 11/20/10.

(AR 449.)

On December 13, 2010, Plaintiff attended a follow up appointment with Dr. Chava, who

noted that, according to Plaintiff,

> his symptoms of anxiety and depression have significantly improved.  He returned
> to work and is doing fairly well.  No further incidents at work reported.  He is
> accepting the supervision and monitoring at work.  He reports improved mood and
> anxiety.  He is physically active and is happy with the improvements.  Denied any
> suicidality, homicidality, psychosis, or other safety concerns.  He is continuing to
> maintain sobriety from alcohol.  No changes in psychosocial or medical status.

(AR 468.)  Plaintiff was instructed to continue taking 20 mg. Prozac daily.  (AR 467.)

Plaintiff attended another follow up appointment with Dr. Chava on February 18, 2011,

where Dr. Chava similarly noted that, according to Plaintiff,

> his symptoms of anxiety and depression have significantly improved and been
> stable.   He continues to maintain his sobriety.   He is happy with the
> improvements.  He is spending more time with his daughter and her family.  No
> problems at work or home reported.

(AR 472.)

On August 25, 2011, Dr. Chava saw Plaintiff, who presented with a "relapse in his

anxiety and depression with med noncompliance and occupational stress." (AR 475.)  Plaintiff reported that he "had difficulty with a peer at work," that he felt "slighted and threatened by the peer," which in turn "led him complaining [sic] to postal inspector." (AR 476.)  Plaintiff "was asked by his supervisor, which led to this appt." (AR 476.)   Plaintiff also reports he "stopped Prozac some time ago," and "used alcohol a few times in the last week since this event." (AR 476.)   Plaintiff was instructed to restart 20 mg. Prozac daily.  (AR 476.)  That next day, on August 26, 2011, Plaintiff presented to the VA Emergency Department complaining of "chest pain and headache, feeling stressed out and depressed." (AR 346.)  Plaintiff stated that he had been "having problems at work where he has been 'put down' and 'called names' by his coworker every day" and characterized his workplace as a "hostile work environment." (AR 346.)   Plaintiff stated that he gets "extremely stressed out and feels bothered due to all this." (AR 346.)   Plaintiff reported feeling "worthless, hopeless." (AR 346.)  Plaintiff stated "I just want to take a lot of medicaitons [sic] and go to sleep and never wake up." (AR 349.)

On September 20, 2011, Dr. Chava saw Plaintiff, who presented with "improved depression but worsening anxiety." (AR 482.)  Dr. Chava notes that, according to Plaintiff

> his symptoms of depression have slightly improved.  He reports worsening anxiety in the last 3-4 weeks.  He reports getting memories of past traumatic experiences (in Military and from childhood).  Reports difficulties with sleep initiation and maintenance.    Waking    with    distressing    dreams,    sweating,    tachycardia, palpitations, and hypervigilance.  He reports checking for guns or people coming into his home at night . . . .   He reports periodic reactivation of his PTSD symptoms . . . .  Back at work.

(AR 483.)  Dr. Chava diagnosed Plaintiff with "Posttraumatic Stress Disorder – primary" (AR 482) and indicated in his assessment that Plaintiff "meets the criteria for PTSD." (AR 484.)

That next day, September 21, 2011, Plaintiff began meeting with Maureen C. Wolf, a Licensed Marriage and Family Therapist, who was referred to him through his employer's Employee Assistance Program (EAP).  (AR 320-21.)  Plaintiff reported to Ms. Wolf that a coworker "used derogatory terms" and is "physically intimidating." (AR 308.)  Ms. Wolf noted that Plaintiff "denies wanting to harm coworker." (AR 308.)  Ms. Wolf writes that Plaintiff

//

1   has history of untreated trauma beginning at age 4 yrs. old. At 19 exposed to
2   repeated acts of violence in military and believed at any moment that his life
    would end – either at hands of US soldier or at hands of Turkish soldier.
3   Discharged at age 23.

4    (AR 308.)  Ms. Wolf's assessed Plaintiff with "PTSD, chronic," "Maj DO, moderate,"

5   and "Alc Abuse."  (AR 309.)  On October 5, 2011, Plaintiff reported to Ms. Wolf that the

6   nightmares had stopped, he had returned to work and was able to "emotionally distance"

7   himself from the coworker.  (AR 314.)  On October, 12, 2011, Plaintiff reported he was

8   placed on administrative leave at work and attributed an improvement in his anxiety to

9   "not being exposed to 'harassment' at work."  (AR 316.)  On October 13, 2011, Ms. Wolf

10   wrote to "Teri Mendoza":

11   Angel Gomez asked me to write to you.  Mr. Gomez sought treatment with me for
     symptoms related to posttraumatic stress.  I first met with Mr. Gomez on
12   September 21, 2011; he was referred to me through EAP.  Since that time we have
     met weekly.  His symptoms have lessened but he needs further treatment to
13   address his long history of untreated trauma.

14   (AR 322.)

15   On October 29, 2011, Plaintiff called the VA National Suicide Prevention Hotline and

16   stated to the suicide prevention coordinator that he was terminated from his job with the U.S.

17   Postal Service "due to my PTSD."  (AR 527-528.)  Plaintiff reported that he "must have called

18   100 times and left message after message threatening harm to his co-workers," but that he had no

19   recollection of doing it.  (AR 528.)  Plaintiff stated that he had been diagnosed with "anger

20   control problems."  (AR 529.)  Plaintiff denied both past and current intent to act on any plan for

21   self-harm but stated that he wished he would have "died in Turkey."  (AR 529.)  Plaintiff

22   requested help for his PTSD and depression symptoms, e.g., "nightmares, sleep disturbances,

23   extreme worry/fear, not eating for 3-4 days at a time and feelings of hopelessness."  (AR 529.)

24   Plaintiff told the coordinator that he "feels he is unable to hold a job at this time due to the

25   severity of his symptoms."  (AR 529.)

26   Plaintiff was seen by Dr. D'Souza on November 2, 2011.  Plaintiff reported that he had a

27   "difficult time at work and was constantly subjected to harassment."  Plaintiff stated that he was

28   "accused of leaving threatening messages on his supervisor's voice mail," which he "adamantly

denies," but that the "administration considered these messages threats and placed him on administrative leave" and ultimately terminated him. (AR 525.) Plaintiff that his symptoms (panic attacks, chest pounding, racing heart rate, sweating, and nightmares) have "subsided now" and that he "sleeps okay." (AR 525.) Plaintiff attributed his "difficulty at work to his PTSD symptoms." (AR 525.) Plaintiff reported that he lives with his daughter and her husband, that he smokes cannabis "daily" and "drinks a glass of rum at night to induce sleep." (AR 525) Dr. D'Souza's assessment was that Plaintiff had "[a]djustment disorder with anxiety" and "PTSD by [history]." (AR 525.) On November 17, 2011, Licensed Marriage and Family Therapist Ms. Wolf observed that Plaintiff had missed three scheduled appointments due to his being terminated. (AR 316.) Plaintiff reported that he had been "drinking to cope with feeling of having no purpose." (AR 316.)

On December 6, 2011, Plaintiff was evaluated by Dr. McKee at the VA, who noted that "PTSD diagnosis is SUGGESTED" based on several "self report assessment[s]" that are "not sufficient to use alone for diagnostic purposes." (AR 513-520.) Dr. McKee further noted that "[a]s [Plaintiff] presents with co-occurring symptoms of PTSD, depression and alcohol abuse, he is a good candidate" for the "Freedom in Safety" PTSD coping skills group. (AR 522.) That next day, December 7, 2011, Plaintiff attended his first group session, with Dr. McKee leading the group. (AR 512-513.)

From January to April 2012, Plaintiff attended the PTSD coping skills group sessions with Dr. McKee. (AR 501-04, 506, 660, 661, 654-56.) During the session on January 1, Dr. McKee noted that Plaintiff was an "active participant, sharing his own experiences and listening attentively to the presentation and the experience of others." (AR 506.) Plaintiff related that he received from the group "greater awareness that PTSD is a biological issue[] and he should not blame himself for it." (AR 506.) During an individual case management session with Dr. McKee on January 4, 2012, Plaintiff presented with

> euthymic mood and related feeling 'good.' His primary concern is difficulty with job and related litigation concerning a misconduct charge. In processing, [Plaintiff] realizes he cannot return to this job due to the heightened stress at the Post office and his PTSD symptoms were triggered as a result. Much of the

1  2

> session focused on development of sobriety contract . . . .  During the session [Plaintiff] appeared open and engaged.  His thought processes were coherent and future oriented.

3   (AR 504-05.)

4   At the next group session, on January 10, 2012, Plaintiff reported feeling "anxious" about

5   "work litigation," and felt he was "not coping well."  (AR 502.)  Plaintiff reported that he had

6   "purchased a six pack the previous evening and drank three beers" and he "tended to monopolize

7   group time and focus on his drinking behavior."  (AR 502.)  Later in January, Plaintiff presented

8   at the group session with "euthymic mood and reported that he was feeling 'relaxed and at

9   peace," relating that he was coping by "working on fixing cars."  (AR 501.)

10   Dr. McKee wrote a letter addressed to "To Whom It May Concern" on February 8, 2012,

11   wherein she stated that Plaintiff's

12  13  14  15  16  17  18

> diagnoses include Posttraumatic Stress Disorder, Depressive Disorder, NOS and Alcohol Dependence.  The group he participates in is an integrated treatment for PTSD and Substance Use Disorders.  The psychoeducation portion of the treatment focuses on coping with the symptoms of PTSD, anger management, communication skills and management of substance use disorder.  [Plaintiff] [a]ttends groups regularly.  He is an active member of [the] group and interacts with and provides support for other veterans in the group appropriately.  [Plaintiff] reports that out of group he is experiencing a reduction in his PTSD symptoms, including a decrease in anger and reduced imbibing of alcohol.  Additionally, [Plaintiff] has attended several PTSD 101 groups which provide educational presentations on PTSD.

19   (AR 659.)

20   On February 15, 2012, a Disability Determinations Service psychiatric consultant, P.M.

21   Balson, M.D., reviewed the record and analyzed the case.  (AR 69-74.)   Dr. Balson noted that

22   Plaintiff was

23  24

> agitated, appeared confused and disoriented.  Showed signed of low self esteem, lack of knowledge of medical information. had [sic] a lot of difficulty remembering dates and medical history.

25   (AR 69.) Dr. Balson noted that Plaintiff's activities of daily living ("ADL's") included caring for

26   pets with help, preparing own meals, doing household chores, and driving and shopping.  (AR

27   69.) Dr. Balson also noted that Plaintiff had a "hygiene problem" and that he was "not good with

28   instructions or stress."  (AR 69.)  Dr. Balson observed that Plaintiff had recently been referred for

1    individual alcohol counseling at the VA, but that Plaintiff had not yet followed up on this referral.

2    (AR 70.)   Dr. Balson also found that Plaintiff's medical records showed that Plaintiff was

3    compliant with medications and his mental status examinations are all within normal limits.  (AR

4    70.)   Although Dr. Balson noted that Plaintiff had one emergency room visit from 2011 for

5    suicidal ideation, Dr. Balson concluded that Plaintiff is "otherwise doing well": "[a]ll of his

6    recent [mental status examinations] were [normal], he relates well, is attentive and no current

7    indication of SI."  (AR 70.)  Dr. Balson continued: Plaintiff

8           does suffer from anxiety and [symptoms] of PTSD, but [Plaintiff's] [psychiatric]
             condition is controlled with meds.  His [activities of daily living] are not marked,
9           he is able to prepare meals, do [household chores] and drive.

10   (AR 70.)  From this, Dr. Balson concluded that Plaintiff's mental impairment was non-

11   severe.  (AR 70.)

12         At a group session on March 25, 2012, Plaintiff related that he was feeling "awesome and

13   that he had peace of mind as he had not drunk any alcohol for the previous week," and related

14   that he was coping by "talking to his brother-in-law and walking."  (AR 656.)  That next day,

15   however, Plaintiff presented at the group session with a "flat affect" and related he was feeling

16   "tired and that he was in pain."  (AR 655.)  Plaintiff stated that his use of alcohol "fluctuates" but

17   that he had "reduced his intake overall."  (AR 655.)  Plaintiff reported that he was "beginning to

18   see [the] difference in that he was having fewer nightmares and panic attacks," but also related

19   that "he was having a hard time accepting his disability related to both his back and his PTSD."

20   (AR 655.)  Plaintiff stated that he was coping by using "grounding exercises and working on his

21   car."  (AR 655.)

22         On March 28, 2012, Plaintiff was evaluated by Dr. McKee, who once again noted that

23   "PTSD diagnosis is SUGGESTED" based on several "self report assessment[s]" that are "not

24   sufficient to use alone for diagnostic purposes."   (AR 646-652.)  Dr. McKee further noted that

25   Plaintiff

26          responds to self-report measures in a way consistent with a significant decrease in
             PTSD symptoms.  His level of expressed distress relative to depression has also
27          decreased significantly.  Although he has been able to cut back on his alcohol use,
             he continues to imbibe alcohol from time to time.  Upon direct inquiry, [Plaintiff]
28          affirms that, overall, he is experiencing less distress than previously.  He attributes

14

1
2
3

> his high hopelessness score to recently having his Disability claim turned down. [Plaintiff] denied that he had any thoughts of self harm or hurting others. In terms of his therapy, [Plaintiff] reports that he finds the group sessions to be helpful. Group was especially helpful in terms of anger management and learning to think things through before reacting.

4   (AR 652.)

5    On April 2, 2012, Plaintiff was evaluated by Sabeena Acharya, M.D., at the VA

6   psychiatry department.  He complained of "severe back pain" and stated that his PTSD symptoms

7   "have improved somewhat and he's doing well with Prozac 20 mg daily."  Plaintiff reported that

8   his nightmares and flashbacks have subsided with combination of therapy and medication," but

9   did not wish to increase the Prozac dosage to 40 mg.  (AR 642.)

10    On April 4, 2012, Dr. McKee wrote another letter addressed to "To Whom It May

11   Concern," wherein she stated that Plaintiff

12
13
14
15
16
17

> is diagnosed with Posttraumatic Stress Disorder and Depression.  His PTSD is resulting from his military experience.  While in the military he experienced several incidents in which he feared for his death as he was held at gun point.  He also experienced the death of fellow soldiers.  Due to his PTSD, [Plaintiff] experiences difficulties with concentration, modulation of emotions, and at time, behaviors.  He also struggles with paranoid thoughts and hypervigilence [sic] to perceived interpersonal slights.  It is particularly difficult for him to work in settings with other people.  Due to his PTSD and depression, he is disabled at this time.

18   (AR 653.)

19    Dr. McKee saw Plaintiff on April 16, 2012, presenting with "dysthymic mood."  (AR

20   636.)  Plaintiff related that he was feeling "depressed and anxious about his PTSD and difficulties

21   maintaining employment," specifically "distress relative to his inability to concentrate and learn

22   new information."  (AR 636.)   Plaintiff stated that he is also "confused by his prior behavior of

23   making phone calls while on the job."  (AR 636.)   Plaintiff reported a relapse in his drinking in

24   which he drank 5-6 beers after a verbal altercation with a man whom his roommate has invited to

25   stay in his house."  (AR 636.)   Dr. McKee observed that "[a]lthough he has experienced a

26   relapse, Plaintiff reported that generally he is 'doing much better' than before treatment," and that

27   Plaintiff "reports decreased drinking, fewer and less intense nightmares and increased ability to

28   manage his behavior."  (AR 636.)

On June 4, 2012, Dr. Acharya wrote a letter addressed "To whom it may concern" regarding Plaintiff:

> I, Dr. Sabeena Acharya, am a resident physician at the VA Central California Hospital who has seen [Plaintiff] once in the outpatient mental health clinic on April 2, 2012.  Prior to this, he was seen in the mental health clinic regularly by other providers since 2002.  He has been seen for Post Traumatic Stress Disorder (PTSD) and has been compliant with his medications namely Prozac 20 mg daily.  He has received PTSD group therapy from the VA in terms of helping him with his recurrent symptoms.  Currently, the symptoms of PTSD, namely difficulty concentrating, irritability, and difficulty maintaining relationships with colleagues are interfering with his job at the post office.  Due to this, he is unable to perform his duties as expected.  He has been receiving care through the VIA via several different mental health providers and it appears that his PTSD is chronic and therefore the prognosis is poor at this time.  Please feel free to contact me with any concerns or questions.

(AR 635.)

Plaintiff contacted the VA National Suicide Prevention Hotline on June 8, 2012, with "suicidal ideation no plan or intent."  (AR 634.)  Plaintiff reported that he was "struggling with his PTSD and is fed up."  (AR 634.)  During a follow-up call later that same day, Plaintiff reported that he was "doing much better."  (AR 634.)   He stated that he was involved in an "incident" the day prior with a tenant in his complex, who Plaintiff claimed had been using drugs in his residence and resulted in police intervention.  (AR 634.)  Plaintiff reported that the incident resulted in him feeling "frustrated and feeling that PTSD stuff again."  (AR 634.)  Plaintiff admitted that he had consumed a six-pack of beer the night before to cope with stress.  (AR 634.)

On June 13, 2012, Plaintiff was seen by Dr. McKee.  (AR 632.)  Plaintiff presented with "dysthymic mood" and stated that he was "tired of everything" and feeling "very angry."  (AR 632.)  Plaintiff acknowledged that he "has been isolating, has increased his intake of alcohol (did not want to discuss further) and has been short-tempered."  (AR 632.)  Plaintiff reported that he had a recent altercation with a renter, in which the police had been called, and that he was "nearly arrested for attacking [the] renter."  (AR 632.)  Plaintiff "denies any memory of this incident." (AR 632.)   Dr. McKee's assessment of Plaintiff was that he had "Posttraumatic Stress Disorder, severe; Depressive Disorder, NOS; Alcohol Abuse, episodic drinking behavior."   (AR 632.) During a follow-up phone call with Dr. McKee on June 28, 2012, Plaintiff reported that he was

feeling "more calm" and that he was "'keeping busy in spite of [the] pain of working on cars' to distract himself from his thoughts."  (AR 632.)  Dr. McKee observed that Plaintiff sounded "calm and forthcoming."  (AR 632.)

That next day, on June 14, 2012, Plaintiff was interviewed by Field Officer M. Kuncl, who observed that Plaintiff

> was very talkative – not chatty, not cheerful – just plain pitiful – he kept berating his inability to work and repeated the same ideas in various cobinations [sic] of words – but essentially said the same things, I found him dressed shabbily in a t shirt stained with paint, wore glasses, grooming was appropriate, it felt as if he was searching for someone to pity him, he may be severely disabled mentally but a CE may be required to establish his DIB and weed through his extraneous conversation

(AR 284.)

On July 30, 2012, Plaintiff was evaluated by Dr. Acharya.  (AR 612.)  Plaintiff stated that he is under a lot of stress dealing with worker's comp due to an injury he sustained while at work, and endorsed having "specific triggers," after which he relapses into alcohol use.  (AR 612.)  Plaintiff indicated that his mood was "fine this week."  (AR 612.)  Plaintiff was "not interested" in services for alcohol dependence, and reported that he continues to take Prozac, which "helps him stabilize once taken in the morning."  (AR 612.)  Plaintiff was "not interested" in increasing the Prozac dosage.  (AR 612.)  The next day, Dr. McKee evaluated Plaintiff, who presented with "flat affect, but became more animated as the session continued."  Plaintiff reported experiencing "depressed, anxious and agitated mood, as well as problems with obsessive rumination and sleep difficulties."  (AR 608.)  Plaintiff reported that he was continuing to "visit family and friends, work on his truck, watch television, and now watching his diet as well."  (AR 608.)  Dr. McKee observed that during the session Plaintiff appeared "open and engaged."  (AR 609.)

Plaintiff called the VA National Suicide Prevention Hotline again on October 14, 2012, stating that he had a visit with his daughter and granddaughter today, and is "now feeling angry, guilty and frustrated that he isn't still in the military."  (AR 607.)  Plaintiff reported that he "doesn't know what triggers his heightened emotions, but is frustrated he doesn't have more control over when and how they affect his life."  (AR 607.)  Plaintiff "wishes he could re-enlist,

1   and cites listening to the music he played during his time in Turkey [as] one of the only things

2   that helps him feel better, although acknowledged a reduction of his anxiety and anger by

3   speaking with this responder." (AR 607.) During a follow-up call, Plaintiff reported that he had

4   "forgotten to take his medication, and once he took it, he felt better." (AR 607.)

5      On October 26, 2012, Dr. McKee evaluated Plaintiff, who presented with

> irritable and agitated mood and related that he continues to struggle with angry
> and depressed mood, intrusive thoughts, sleep difficulties, isolating from others
> and heightened vigilance. When attempting to identify therapeutic goals,
> [Plaintiff] was unable to do so or identify topic [sic] he would like to address as he
> related he has come to accept "the PTSD will never go away."

9   (AR 714.)   Plaintiff scored a positive score on an alcohol screening test performed at the

10  evaluation. (AR 715.)

11     On January 25, 2013, psychiatric consultant N. Haroun, M.D., reviewed the record and

12  analyzed the case. (AR 89.) Dr. Haroun noted that Plaintiff had been receiving additional

13  treatment for depression, PTSD, and suicidal ideation. (AR 90.) Dr. Haroun observed that

14  Plaintiff was "doing well" on medication, but around April 2012 began feeling "very angry,

15  isolating and increasing his use of alcohol." (AR 90.) Dr. Haroun noted that Plaintiff visited the

16  emergency room in July 2012 feeling "angry and frustrated over life," and in September 2012,

17  Plaintiff presented "depressed, agitated, had sleeplessness, and intrusive thoughts." (AR 90.) Dr.

18  Haroun observed that Plaintiff called the VA suicide hotline in October 2012 feeling "very angry,

19  guilty, and frustrated, and had [suicidal ideation] [without] intent." (AR 90.) Dr. Haroun opined

20  that

> At the initial level [Plaintiff] was sober and compliant with treatment. Hence his
> [mental status examinations] were entirely unremarkable and [Plaintiff] was
> denied as non-severe in 2/2012. The more recent [medical record] starting in 4/12
> shows that [Plaintiff] relapsed and there is evidence that started drinking again.
> Despite this his [mental status examinations] improve when he is in treatment and
> based on the evidence he should be able to perform at least [simple repetitive
> tasks] with [limited public contact] as long has [sic] he is sober and treatment
> complaint.

27  (AR 90.) Dr. Haroun further opined that Plaintiff had no restriction of activities of daily living,

28  mild difficulties in maintaining social functioning, and moderate difficulties in maintaining

1  concentration, persistence, or pace.  (AR 91-92.)  Dr. Haroun observed that there was insufficient

2  evidence of repeated episodes of decompensation of extended duration.  (AR 92.)

3          On February 10, 2013, Plaintiff once again called the VA National Suicide Prevention

4  Hotline, reporting "struggling with chronic pain and PTSD . . . . "  (AR 709.)  Plaintiff stated that

5  therapy at the VA was helping but that he can no longer afford it," and that he "self-medicates

6  with beer."  (AR 710.)  Plaintiff also reported seeing a psychiatrist at Kaiser once a month but

7  "feels he needs additional care but cannot afford it."  (AR 710.)   Dr. McKee contacted Plaintiff

8  on February 15, 2013, as a follow-up to his Hotline calls.  Plaintiff related that he is "frustrated

9  with his finances and that his Disability is about to be lowered," but that he is "feeling somewhat

10 better emotionally as he now has a female roommate who [keeps] his house clean."  (AR 708.)

11 Dr. McKee noted that, "[d]ue to his finances, [Plaintiff] is unable to come to VA for psychiatric

12 services, but goes to Kaiser as he has insurance there."  (AR 708.)

13         Between June and October 2013, Plaintiff called the VA National Suicide Prevention

14 Hotline six (6) times.  Plaintiff would report that he was "angry about several issues in his life"

15 (AR 707); that he is "tired of continuing nightmares and flashbacks from his past history of

16 trauma" (AR 707);  that he "takes Zoloft" but "the medication stopped working for him" (AR

17 706); that he "drinks when frustrated" (AR 706); that he "wishes there was a magic pill

18 developed to erase the memories of his service in Turkey" (AR 704); how the symptoms of PTSD

19 "ruined his life" (AR 701); how he feels that the medications "had no therapeutic effect" on him

20 (AR 701); that he has "nightmares which brings up memories of his experience in Turkey" (AR

21 697); that there has been "some improvement in that he no longer feels like killing people" but

22 that "his emotions are like a roller coaster and that he feels like he has no control over them" (AR

23 696).   After one such call, on August 14, 2013, the responder wrote that Plaintiff presented as

24          hostile and argumentative . . . .  [and] manipulative and gamey.  He changed his
         story several times and it was difficult to determine whether the information
25          regarding his abuse and other stories of warfare are accurate.

26 (AR 705.)  Plaintiff acknowledged that he would call the Hotline on a "vulgar tirade blaming the

27 responder for his current situation" but that when he hangs up he feels "remorseful and frustrated

28 with his actions."  (AR 701.)  During this time period, Plaintiff lived with his daughter, who he

called "understanding and supportive." (AR 701.)  At one point during a Hotline call, Plaintiff passed the phone to his daughter, who stated that her father was "fine."

### 2.     Physical

On December 17, 2009, Plaintiff sustained a low back injury at work when he was bending over to pick up some mail under a machine and felt a "loud pop" in his low back.  (AR 335; 681.)  Plaintiff experienced severe low back pain and left lower extremity pain.   (AR 335.)  The next day, on December 18, 2009, Plaintiff presented to the Emergency Department at Community Regional Medical Center, where the clinical impression indicated that Plaintiff suffered from an "Acute Myofascial Strain" in the lumbar area of his back.  (AR 685.)

Following the injury, Plaintiff attempted to return to work without restriction, but his low back and lower extremity pain markedly increased.  (AR 335.)  On February 26, 2010, Plaintiff presented at the VA Emergency Room on February 26, 2010, with "severe lumbarsacral [sic] pain," reporting having "pain all over," "spastic like movements from the pain," and being "unable to move his right leg due to pain."  (AR 407.)

On March 10, 2010, Plaintiff underwent lumbar surgery involving L5-SI diskectomy, fusion, and instrumentation.  (AR 335.)   Two months after the surgery, Plaintiff returned to work without specific restrictions. (AR 335.)   In July 2010, Plaintiff reported that the surgery went "really well," that there was "no pain," and that he was able to "life [sic] weights." (AR 393.)

On October 30, 2013, Plaintiff was seen by Donald Myers, M.D., who noted that about two months after his surgery, Plaintiff "felt recurrence of his pain while squatting . . . [which] has persisted for the last three years." (AR 733.)  Plaintiff reported that he was "unable to walk any distance because of his severe buttock and leg pain," that his "back pain is fairly constant regardless of activity," and that his "buttock and leg pain become severe and intolerable with activity." (AR 733.)   Dr. Myers' impression was that Plaintiff's prior back surgery "failed," and he recommended that Plaintiff undergo another lumbar MRI and CT of lumbar spine to evaluate fusion. (AR 734.)

The next day, October 31, 2013, Plaintiff saw Michael Runge, D.O., upon referral by Dr. Myers.  (AR 736.)  Plaintiff reported to Dr. Runge that he "can walk less than a quarter mile

before he has to stop because of leg pains" and that Plaintiff has a "constant low back pain." (AR

739.) Dr. Runge ordered an MRI and CT scan of Plaintiff's lumbar spine, which were completed

on December 10, 2013. (AR 740-57.)

On December 12, 2013, Plaintiff saw Dr. Runge to review the results of the MRI and the

CT scan. Dr. Runge noted that Plaintiff was in "mild distress" and that he had

> difficulty standing from a chair, gait normal, can get on feels and toes, no foot
> drop. Nontender back and buttock. Flex 50, ext 20 with pain down posterior right
> thigh. SB 20 each. SLR right @ 70 pain right posterior thigh.

(AR 757.) Dr. Runge reviewed the MRI results and noted

> [p]ostsurgical changes L5-S1 with no evidence for central canal or foraminal
> stenosis at any level. No real change from prior study. The soft tissue edema
> changes posterior to the laminectomy at L5-S1 have decreased. Mild rightward
> asymmetric T12-L1 disc protrusion is stable.

(AR 758.) Dr. Runge suggested that Plaintiff might be a candidate for spinal stimulator and

recommended a follow-up appointment with Dr. Myers. (AR 758.)

On December 17, 2013, Dr. Myers saw Plaintiff for a follow up appointment. (AR 762.)

Dr. Myers reviewed the radiology results, noting "[s]atisfactory appearing L5-S1

instrumentation," and that the "MRI, CT, and plain films are all very satisfactory and suggest no

ongoing problem in the lumbar spine." (AR 764.) Dr. Myers' impression was that Plaintiff

experienced "[b]uttock and deep radiating leg pain after surgery of uncertain etiology." (AR

764.) Dr. Myers' treatment "plan" recommended that Plaintiff begin lumbar stretching exercises

and that he "[c]onsider other pain control options," and noted "Chronic Pain Syndrome" as part

of the plan. (AR 764.)

**B.      Plaintiff's Statement**

On January 27, 2012, Plaintiff completed a function report. (AR 264.) When asked to

describe what he did from the time he wakes up to the time he goes to bed, Plaintiff reported that

he took his pills, attended group therapy at the VA Hospital, and visited his sister. (AR 265.)

Plaintiff fed his two dogs and his roommates helped make sure that his pets did not run out of

food and water. (AR 265.) He responded that it was painful to put on clothes because of back

pain, that he had trouble washing his feet, that he did his own hair, but that his shoulders hurt

when he shaves.  (AR 265.)  Plaintiff did not cook like he used to, but instead ate out or went to his sister's.  (AR 265.)  Plaintiff reported that he sometimes forgot to brush his teeth or shave. (AR 266.)   He prepared sandwiches and frozen food weekly, and did laundry, vacuuming, dusting, and wiping of tables for two to three hours.  (AR 266.)  He went outside two to three times a day and drove alone.    (AR 267.)  Plaintiff went shopping for groceries and other household needs for about an hour every three to four weeks.  (AR 267.)  Plaintiff was able to pay bills, count change, handle a savings account, and use a checkbook.  (AR 267.)  Plaintiff's hobbies were watching television (daily) and cooking on the barbecue (once a week or every two weeks).  (AR 268.)  Plaintiff spent time with others two or three times a week.  (AR 268.) Plaintiff could walk one mile before needing to rest, and could resume walking after 15 minutes. (AR 269.)  Plaintiff could pay attention for a half of an hour.  (AR 269.)  When asked whether Plaintiff had ever been fired or laid off from a job because of problems getting along with people, Plaintiff answered "No."  (AR 270.)

Plaintiff completed a disability report in which he indicated he stopped working as an Electronic Technician at the Postal Service  because of his "condition(s) and other reasons."  (AR 231.)   Plaintiff explained in the disability report that he was terminated from his job for something that he does not recall doing.  (AR 231.)

**C.      Plaintiff's Nephew's Statement**

On January 8, 2012, Plaintiff's nephew Jose Velez completed a third party function report.  (AR 275.)  Mr. Velez previously lived with Plaintiff.  (AR 275.)  Mr. Velez reported that Plaintiff fed his pets if he remembered, otherwise Mr. Velez would feed them.  (AR 276.)  Mr. Velez reported that Plaintiff did not dress as clean and neatly as he once did and that he sometimes does not shower, shave, or brush his teeth unless reminded. (AR 276-77.)  Mr. Velez reported that Plaintiff occasionally makes a sandwich or a "TV dinner," but most times he eats out.  (AR 276.)  Mr. Velez reported that Plaintiff would do laundry or light cleaning when told to do so, and he would spend approximately one to two hours on chores once or twice a month. (AR 277.)   According to Mr. Velez, Plaintiff shopped for toiletries, pet food, cigarettes, ham, cheese, and bread for an hour about once every two weeks.  (AR 278.)  Mr. Velez reported that

1  Plaintiff spends time with others two to three times a week.  (AR 279.)   According to Mr. Velez,

2  Plaintiff could walk about one mile before needing to rest and can resume walking after 15

3  minutes.  (AR 280.)   When asked whether Plaintiff has ever been fired or laid off from a job

4  because of problems getting alone with other people, Mr. Velez answered "Yes," and explained

5  Plaintiff was fired "due to work related stress that affected his mental condition."  (AR 281.)

6  **D.     Administrative Proceedings**

7       Plaintiff filed an application for DIB on November 28, 2011, alleging disability since

8  November 7, 2011.  (AR 16, 227-29.)   The agency denied Plaintiff's application for benefits

9  initially on February 27, 2012, and again on reconsideration on February 25, 2013.  (AR 16, 98-

10  110.)  On January 24, 2014, Plaintiff appeared with counsel and testified before an administrative

11  law judge ("ALJ").  (AR 37-64.)   In a decision dated March 24, 2014, the ALJ found that

12  Plaintiff was not disabled.  (AR 13-30.)  The ALJ's decision became the final decision of the

13  Commissioner when the Appeals Council denied Plaintiff's request for review on February 19,

14  2015. (AR 3-7.)

15       **1.     Plaintiff's Testimony**

16       Plaintiff testified he was 54 years old at the time of the hearing and lived with his

17  daughter, her son, her fiancée, and Plaintiff's nephew.  (AR 39, 45.)  Plaintiff graduated high

18  school and attended some college, but did not earn a degree.  (AR 39.)   Plaintiff was last

19  employed by the Postal Service as an electronics technician.  (AR 40.)   Plaintiff received

20  retirement income from his years at the Postal Service.  (AR 49.)

21       Plaintiff testified that he has been unable to work since November 7, 2011, due to mental

22  and physical problems.  (AR 40-41.)  Specifically, Plaintiff testified he "can't be around people,"

23  that he "change[s]," "become[s] a different person" and "alert."  (AR 41.)  He stated that if it gets

24  bad enough, "it can take me back to the military," that he feels "that everybody's out to get me,"

25  and that it is his "worst nightmare."  (AR 42.)   With respect to his back pain, he testified that it

26  was "constant," that he "can't deal" with it, and that it "radiates down" his leg.  (AR 42.)

27  Plaintiff stated that "[w]hen it does that it goes all the way from my buttocks to the top of my foot

28  and it feels like somebody just driving a knife in there a twisting it."  (AR 42.)  Plaintiff testified

1  that his back pain can be so severe that he will fall.  (AR 42.)

2          Plaintiff testified that he was covered by insurance through Kaiser, that Kaiser was

3  treating him for mental and physical problems, and that the last time he went to Kaiser for

4  treatment was about three or four months prior.  (AR 42-43.)  Plaintiff took Lisinopril for his

5  hypertension and Sertraline (Zoloft) for his mental issues.  (AR 43.)  Plaintiff testified that he

6  does not believe that medication that he takes for mental health helps him feel better, but that the

7  medication he takes for hypertension "seems to be working fine."  (AR 44.)     Plaintiff testified

8  that he cannot take painkillers because "they induce a behavior that I don't like . . . not a healthy

9  behavior."  (AR 43.)

10          Plaintiff testified that he bathed and dressed himself, that he prepares sandwiches and

11  other similar meals, and he does laundry, sometimes with the assistance of his daughter, and that

12  he does "very limited" housework.  (AR 45.)  Specifically, Plaintiff would use a hose to wash

13  down the driveway, he did the dishes, and he swept outside.  (AR 45-46.)  Plaintiff shopped with

14  his daughter and helped her feed and clean up after their pets (two dogs and three cats).  (AR 45-

15  46.)  Plaintiff would take his two-year-old grandson for short walks four or five houses down the

16  street, and would on occasion, hold his grandson but not for very long.  (AR 47.)

17          Plaintiff testified that he could bend at the waist with pain and the heaviest thing he could

18  lift is a bag of groceries.  (AR 48.)  Plaintiff testified that he was feeling pain at the hearing while

19  sitting.  (AR 48.)  Plaintiff watched television lying down and slept with his clothes on because

20  it's "easier."  (AR 50.)  Plaintiff testified that he would try to take showers normally, but that he

21  would avoid showers because he was afraid he would fall.  (AR 51.)  Plaintiff has fallen

22  occasionally outside the bathtub; it sometimes happened twice in a month, sometimes he went a

23  month without falling.  (AR 51.)  Plaintiff testified that since his surgery, his pain has fluctuated.

24  (AR 52.)

25          Regarding Plaintiff's anxiety, Plaintiff testified that the number of days in a week that he

26  felt anxious or nervous "depend[ed]," and that "[t]he minute I am exposed to stress I have

27  problems."  (AR 53.)   When asked what situations proved stressful for Plaintiff, he responded:

28  "Any confrontation.  Any type of confrontation.  I don't know what trigger [sic] this thing."  (AR

53.)   Plaintiff initially testified that that he didn't talk to his family members anymore, but then later stated that he talks to the people in his home, including his daughter.  (AR 53.)   Plaintiff testified that last week he "went crazy" on his daughter for "no reason," that he used "very bad language," and that he was arrested by the police and spent the night in jail as a result.  (AR 54-55.)  Plaintiff testified that he doesn't remember what the police told him as to why he was being arrested.  (AR 55.)  Plaintiff testified that he has had similar episodes on and off throughout his life following his discharge from the military.  (AR 55.)   Plaintiff has had suicidal thoughts and most recently had suicidal thoughts that prior week, but he did not act on the suicidal thoughts and has never acted on them.  (AR 56.)  Plaintiff testified that he drinks alcohol when he's under stress to "knock [himself] out."  (AR 58.)

### 2.     Vocational Expert's Testimony

The ALJ asked the Vocational Expert ("VE") to consider a person of Plaintiff's age, education, and with his work experience.  The VE was also to assume this person can perform simple, repetitive tasks, with limited public contact.  (AR 61.)  The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform other work as a welder, form machine operator, or a package machine operator.  (AR 61-62.)

Plaintiff's counsel asked a follow up question regarding the hypothetical worker who had the same vocational factors as Plaintiff but could sit approximately one hour out of eight, could stand approximately one hour, and could walk only thirty (30) minutes.  The VE testified there would be no work available in those circumstances.  (AR 62.)

Plaintiff's counsel also asked whether a person who could not interact appropriately with supervisors, co-workers, or the general public, could not handle the stress and pressure associated with an eight hour workday in a forty (40) hour workweek, could perform Plaintiff's past relevant work or any other work.  The VE testified such a person could neither perform Plaintiff's past relevant work nor perform any other work.  (AR 63.)

Finally, Plaintiff's counsel asked whether a person limited as posed in the ALJ's hypothetical who could not stay on task for two hour increments and would be off task fifteen percent of the time could perform Plaintiff's past relevant work or any other work.  The VE

1   testified such a person could neither perform Plaintiff's past relevant work nor perform any other

2   work.  (AR 63.)

3   **E.      The ALJ's Decision**

4          The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920.  (AR

5   17-30.)[3]   The ALJ found that Plaintiff had the severe impairments of (1) anxiety disorder, (2)

6   mood disorder, and (3) alcohol abuse (step two).  (AR 24.)  However, Plaintiff did not have an

7   impairment or combination of impairments that met or medically equaled one of the listed

8   impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 18-

9   20.)  The ALJ determined that Plaintiff had the residual functional capacity ("RFC")[4] to perform

10  a full range of work at all exertional levels but with the following nonexertional limitations: he is

11  able to perform simple repetitive tasks with limited public contact.  (AR 20.)  Given his RFC, the

12  ALJ determined that Plaintiff was unable to perform any past relevant work, but that Plaintiff was

13  not disabled because he could perform a significant number of other jobs in the national economy

14  (step five).  (AR 29-30.)  In reaching his conclusions, the ALJ also determined that Plaintiff's

15  subjective complaints were not fully credible.  (AR 28-29.)

16                          **III. SCOPE OF REVIEW**

17         The ALJ's decision denying benefits "will be disturbed only if that decision is not

18  supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599,

19  601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

20  judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

21  Instead, the Court must determine whether the Commissioner applied the proper legal standards

22  and whether substantial evidence exists in the record to support the Commissioner's findings.

23

---

24  [3] The ALJ did not decide whether Plaintiff had engaged in substantial gainful activity since the alleged onset date of
    November 7, 2011, because he found it was not dispositive of Plaintiff's claim of disability.  (AR 18.)

25  [4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a
    work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.

26  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result
    from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a

27  claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay
    evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable

28  impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

1   *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  "Substantial evidence is more than a

2   mere scintilla but less than a preponderance."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198

3   (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind

4   might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401

5   (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court

6   "must consider the entire record as a whole, weighing both the evidence that supports and the

7   evidence that detracts from the Commissioner's conclusion, and may not affirm simply by

8   isolating a specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028,

9   1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

10                                    **IV. APPLICABLE LAW**

11          An individual is considered disabled for purposes of disability benefits if he or she is

12   unable to engage in any substantial, gainful activity by reason of any medically determinable

13   physical or mental impairment that can be expected to result in death or that has lasted, or can be

14   expected to last, for a continuous period of not less than twelve months.   42 U.S.C.

15   §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The

16   impairment or impairments must result from anatomical, physiological, or psychological

17   abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic

18   techniques and must be of such severity that the claimant is not only unable to do her previous

19   work, but cannot, considering her age, education, and work experience, engage in any other kind

20   of substantial, gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3),

21   1382c(a)(3)(B), (D).

22          The regulations provide that the ALJ must undertake a specific five-step sequential

23   analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine

24   whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§

25   404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the

26   claimant has a severe impairment or a combination of impairments significantly limiting her from

27   performing basic work activities.  *Id*. §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the

28   ALJ must determine whether the claimant has a severe impairment or combination of

impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20

C.F.R. 404, Subpart P, App. 1.  *Id.* §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the

ALJ must determine whether the claimant has sufficient residual functional capacity despite the

impairment or various limitations to perform her past work.  *Id.* §§ 404.1520(f), 416.920(f).  If

not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform

other work that exists in significant numbers in the national economy.  *Id.* §§ 404.1520(g),

416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there

is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir.

1999); 20 C.F.R. §§ 404.1520, 416.920.

## V. DISCUSSION

Plaintiff contends that the ALJ erred by substituting his own judgment for competent

medical evidence, by improperly discrediting Plaintiff's treating physicians, and by improperly

discrediting Plaintiff's nephew Jose Velez's testimony.  The Commissioner contends that the ALJ

properly weighed the medical evidence and provided germane reasons for discounting the lay

witness testimony.

**A.     The ALJ's Consideration of the Medical Evidence**

**1.     Legal Standard**

The medical opinions of three types of medical sources are recognized in Social Security

cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not

treat the claimant (examining physicians); and (3) those who neither examine nor treat the

claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Generally, an examining physician's opinion is entitled to greater weight than a non-examining

physician's opinion.  *Id.*  Where a treating or examining doctor's medical opinion is contradicted

by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting

that medical opinion, and those reasons must be supported by substantial evidence in the record.

*Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009).

The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and

conflicting clinical evidence, stating her interpretation thereof, and making findings.  *Tommasetti*

*v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).  Factors relevant to evaluating medical opinions include the amount of relevant evidence that supports the opinion and the quality of the explanation provided and the consistency of the medical opinion with the record as a whole.  *See Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(3)-(6)).

### 2. The ALJ Erred by Substituting His Own Medical Opinion for that of Plaintiff's Treating Physicians.

The ALJ rejected Plaintiff's entire longitudinal treatment history based on his own lay interpretation of a single clinical note.  (AR 22.)  The ALJ described the May 27, 2009, mental status examination results as follows:

> On May 27, 2009, [Plaintiff's] major problem was nightmares.  He denied ever having been in combat, but had dreamed about someone pointing a rifle at him and asking: "Do you want to die?"  In addition, he reported dreaming about a Turkish man shooting someone in the head.  He dreamt of maggots in someone's pant leg.  He mentioned these dreams keep changing.  He reported using alcohol to sleep (Exhibit 3F, pp 41-42).

(AR 22.)

The ALJ observed that "[t]he significance of this report is that subsequent clinician's [sic] apparently assumed the claimant's dreams involved real events, and as a consequence, diagnosed post-traumatic stress disorder (PTSD)." (AR 22.)  This observation presupposes a causal relationship between a soldier's involvement in combat situations and trauma-induced nightmares, from which the ALJ apparently concluded that Plaintiff's reported PTSD symptoms could not have derived from his military experience.  The ALJ then rejected every single independent diagnosis of PTSD made throughout Plaintiff's medical history on the basis of his conclusion that an individual who had never been in a combat situation could not possibly suffer from military service-connected PTSD.  (AR 22, 24; *cf.* AR 309, 354, 362, 356-57, 359, 412, 482-84, 513-20, 525, 632, 635, 646-53, 659.)  In so doing, the ALJ rendered a medical opinion as to the source of Plaintiff's symptoms and the validity of the diagnosis of PTSD.  This was a medical determination the ALJ was not qualified to make.  *Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) ("An ALJ cannot arbitrarily substitute his own judgment for competent medical opinion .  .  . and .  .  . must not succumb to the temptation to play doctor and make [his]

own independent medical findings.")  (internal citations omitted).  *Cf. Penny v. Sullivan*, 2 F.3d 953, 958 (9th Cir. 1993) ("Without a personal medical evaluation it is almost impossible to assess the residual functional capacity of any individual.").   An ALJ cannot employ his own speculations as the basis for his findings.  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2001) (an ALJ must articulate specific and legitimate reasons based on substantial evidence in the record to reject a treating physician's opinions).

The Commissioner cites to the "diagnoses of PTSD" referencing Plaintiff's nightmares made by clinicians Jeffrey J. Fay and Teresa Myers, M.D., and argues that these diagnoses are "directly contradicted" by Dr. Raroque's note regarding Plaintiff's lack of combat experience. (Doc. 17, p. 5.)  As an initial matter, Dr. Myers did not specifically "diagnose" Plaintiff with PTSD based on reports of nightmares.  Rather, Dr. Myers observed that Plaintiff's complaints included "*some PTSD-type [symptoms]* of nightmares of military experience in Turkey, from which he wakes in a cold-sweat with racing heart."  (AR 413 (emphasis added).)   More importantly, these medical records are not "directly contradictory."   Plaintiff's denial of participating in combat or experiencing combat scenarios does not render a PTSD diagnosis arising from his military service invalid.  Just as not every soldier who experiences combat develops PTSD, combat experience is *not* a prerequisite to a PTSD diagnosis.

Setting aside the fact that Plaintiff reported his military service as having been "'just like combat' due to having 'marshal law' declared on multiple occasions while he was in Turkey" (AR 405), a review of the medical record reveals that no clinician ever opined that PTSD could only arise from combat experiences or that Plaintiff's service-connected PTSD was predicated on combat experiences, only that it arose from Plaintiff's experiences serving in the military while stationed in Turkey.  (*See, e.g.,* AR 398, 412-13, 653.)   Indeed, contrary to the ALJ's interpretation of the dreams, the specific subject matter does not compel a conclusion that they were based on combat experiences.  (*See, e.g.,* AR 405, 409.)

Dr. McKee noted "[w]hile in the military [Plaintiff] experienced several incidents in which he feared for his death as he was held at gun point . . . [and] also experienced the death of

//

1  fellow soldiers." (AR 653.)  The record is silent as to whether these reports are true or not.[5]  But

2  even if these specific reports were demonstrably false, such would not necessarily negate Dr.

3  McKee's diagnosis of PTSD.  Regardless, the ALJ did not make a finding with respect to whether

4  Plaintiff's nightmares were based on real events and the Court will not base its decision on

5  reasoning not articulated by the ALJ or on a ground on which he did not rely.  Orn, 495 F.3d at

6  630.  Rather, the ALJ found that because Plaintiff had never been in combat, he could not

7  possibly have been suffering from PTSD.  (AR 22.)

8      The Commissioner points to Dr. McKee's statement that Plaintiff's "scores on testing for

9  PTSD were higher than ordinarily seen in veterans with PTSD" (AR 23, 230), apparently

10  suggesting that Plaintiff was over-reporting his symptoms.  Over-reporting of symptoms,

11  however, is not the same as falsely reporting.  Further, the ALJ specifically found Plaintiff was

12  not malingering.  (AR 20-29.)  As discussed above, the only reason the ALJ provided for

13  rejecting Plaintiff's repeated PTSD diagnosis is that clinicians falsely assumed Plaintiff's

14  nightmares were based on real events, given that Plaintiff admitted he had not been involved in

15  combat during his military service.  (AR 22.)

16      Although the Commissioner now attempts to justify the ALJ's analysis by offering post-

17  hoc rationale to support it (Doc. 17, p. 5), a reviewing court cannot affirm the denial of benefits

18  based on a reason not stated or finding not made by the ALJ, and the Commissioner's after-the-

19  fact attempt to supply an acceptable basis for the ALJ's decision is unavailing.  *See, e.g., Pinto v.*

20  *Massanari*, 249 F.3d 840, 847-48 (9th Cir. 2001) (an agency decision cannot be affirmed based

21  on a ground that the agency did not invoke in making its decision); *see also Barbato v. Comm'r*

22  *of Soc. Sec. Admin.*, 923 F. Supp. 1273, 1276 n.2 (C.D. Cal. 1996) (remand is appropriate when a

23  decision does not adequately explain how a decision was reached, "[a]nd that is so even if [the

24  Commissioner] can offer proper post hoc explanations for such unexplained conclusions," for

25  _____

26  [5] The only note in the medical record that in any way bears on Plaintiff's veracity of his reports of his military service is the report of Plaintiff's August 14, 2013, call to the VA National Suicide Prevention hotline, where the responder observes that Plaintiff "changed his story several times and it was difficult to determine whether the

27  information regarding his abuse and other stories of warfare are accurate."  (AR 705.)  This note does not disprove Plaintiff's subjective complaints, but, even if it did, it is immaterial, as the ALJ did not predicate his rejection of Plaintiff's PTSD diagnosis on Plaintiff's credibility or lack thereof.  *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir.

28  2003) (the reviewing court is constrained to review the reasons the ALJ asserts).

1   "the Commissioner's decision must stand or fall with the reasons set forth in the ALJ's decision,

2   as adopted by the Appeals Council") (citation omitted).

3       Notably, Plaintiff does not dispute the ALJ's negative credibility finding with respect to

4   Plaintiff's testimony and statements.   To the extent any physician's diagnoses and opinions as to

5   the limitations imposed by Plaintiff's alleged impairments were based, in whole or in part, on

6   Plaintiff's subjective reports, the ALJ could have properly discredited those reports.   Plaintiff

7   demonstrated on numerous occasions that, with medication, he experienced a "significant

8   improvement in his anxiety, depression, irritability, sleep initiation difficulties, job performance,

9   and relational difficulties" (AR 456), and that medication had an overall "positive effect" (AR

10  396).   (*See also* AR 90, 398, 459, 463, 468, 504-05, 607, 612, 642, 659.)   While on medication,

11  Plaintiff had returned to work, was "doing fairly well," and was "accepting the supervision and

12  monitoring at work" with "no further incidents . . . reported."   (AR 468.)   From 2011-2012,

13  Plaintiff was an "active member" of the Freedom in Safety PTSD coping skills group and

14  "interact[ed] with and provide[d] support for other veterans in the group appropriately."   (AR

15  659; *see also* AR 501, 506, 656.)   Finally, as the ALJ observed in discrediting Plaintiff's

16  subjective complaints (AR 28), when Plaintiff decreased or stopped his alcohol consumption, he

17  similarly experienced a decrease in PTSD symptoms.   (AR 398, 468, 655-56.)

18      Despite the extensive evidence of records, however, the only reason articulated by the

19  ALJ in rejecting the PTSD diagnosis is his disbelief that Plaintiff's PTSD could have resulted

20  from military experience in the absence of combat exposure.   (AR 22.)   The ALJ's conclusion

21  that Plaintiff's entire longitudinal treating history for PTSD is not entitled to any weight is

22  therefore made without a permissible reason.   Reciting findings of a doctor and then reaching a

23  conclusion leaves out the analysis which supports the ultimate determination.   *Embrey v. Bowen*,

24  849 F.3d 418, 422 (1988) ("The ALJ must do more than offer his conclusions. He must set forth

25  his own interpretations and explain why they, rather than the doctors', are correct.").   A

26  conclusion standing alone is not conducive to judicial review, and the Court cannot create its own

27  rationale or analysis, or adopt rationale or an explanation offered by the Commissioner post hoc,

28  to determine whether the conclusion can be sustained.   *See Barbato*, 923 F. Supp. at 1276 n.2

1   ("If the decision on its face does not adequately explain how a conclusion was reached, that alone

2   is grounds for a remand.  And that is so even if [the Administration] can offer proper post hoc

3   explanations for such unexplained conclusions.")   (citations omitted).  *See also Gonzalez v.*

4   *Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990) ("[W]e are wary of speculating about the basis of

5   the ALJ's conclusion . . . .  ");  *Lewin v. Schweiker*, 654 F.2d 631, 634-35 (9th Cir. 1981) (ALJ's

6   decision should include a statement of the subordinate factual foundations on which the ALJ's

7   ultimate factual conclusions are based, so that a reviewing court may know the basis for the

8   decision).  In sum, the ALJ erred by substituting his own lay opinion for that of Plaintiff's

9   treating physicians.

10   **3.  The ALJ Did Not Err in His Assessment of the Opinions of Ms. Wolf and Drs.
      McKee and Myers.**

11

12   Plaintiff contends the ALJ's silence as to Ms. Wolf's treatment records indicating that

13   Plaintiff "had been required to attend treatment while on administrative leave from the Postal

14   Service due to his 'poor relationships with co-workers and supervisors' and missing 10 days of

15   the previous four weeks due to emotional problems" was reversible error.  (Doc. 16, p. 18.)  As

16   an initial matter, Ms. Wolf is a not an acceptable medical source.  *Putman v. Colvin*, 586 Fed.

17   Appx. 691, 693 (9th Cir. 2014) (unpublished) (ALJ properly discounted counselor's opinion that

18   claimant had mental impairments that precluded work activity, because she was not an acceptable

19   medical source and her opinion was contradicted by multiple doctors who determined that

20   claimant's impairments were not severe);  *Pierce v. Colvin*, 565 Fed. Appx. 621 (9th Cir. 2014)

21   (unpublished) (ALJ properly gave more weight to the medical expert's testimony over that of a

22   counselor because the expert "was the only acceptable medical source who reviewed [claimant's]

23   entire medical record.").   The ALJ was therefore only required to give germane reasons in

24   discrediting Ms. Wolf's opinion.  *See Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001);  *Stout v.*

25   *Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006);  *see also* 20 C.F.R. §

26   416.913(d)(4).

27   While it is true that the ALJ failed to offer specific reasons for rejecting Ms. Wolf's

28   opinion, as the Commissioner correctly notes, "there was nothing of substance for the ALJ to

address or reject" in his decision.  (Doc. 17, p. 8.)  Ms. Wolf's letter dated October 13, 2011, only

reflects that Plaintiff is in treatment for PTSD and that he needs further treatment.  (AR 322.)

Such error, if any, in not discussing the contents of Ms. Wolf's letter is harmless. *See Carmickle*

*v. Comm'r, Soc. Sec. Admin.,* 533 F.3d 1155, 1162 (9th Cir. 2008); *Stout,* 454 F.3d at 1055

(defining harmless error as such error that is "inconsequential to the ultimate nondisability

determination").  Even assuming that Ms. Wolf did intend to express an opinion as to Plaintiff's

diagnoses, conditions, or functional limitations – which she herself admitted she did not[6] – her

overall assessment of Plaintiff was that there was "no risk of harm."  (AR 307.)  Rather than

bolstering Plaintiff's position, Ms. Wolf's opinion tends to undercut any determination that there

should be limitations placed on Plaintiff's ability to work.  Specifically, Ms. Wolf found that

Plaintiff had no "workplace issues," including: no "Diminished Work Performance," no

"Absenteeism/Tardiness,"      no      "Misconduct/Disruptive      Behavior,"      no      "Safety

Violation/Accident," no "Work Relationship Prb w/ Co-worker," no "Work Relationship Prb w/

Supervisor," and no "Occupational Health Prblm."  (AR 307.)

Plaintiff next argues that the ALJ improperly ignored treating physician Dr. McKee's

"assessment of [Plaintiff's] continuing deterioration and exacerbation of PTSD symptoms noted

in Progress Notes in 2012 through 2013."  (Doc. 16, p. 18.)[7]  Contrary to Plaintiff's suggestion,

however, Dr. McKee never rendered any opinion as to the imposition of a specific limitation on

Plaintiff's ability to work on a sustained basis.  To the extent that the Plaintiff asserts the ALJ

erred by silently rejecting Dr. McKee's opinion by failing to summarize every single one of her

treating notes in his decision, it is unclear what functional limitations Plaintiff believes Dr.

---

[6] On February 2, 2013, Ms. Wolf informed the Department of Social Services that "I have been advised by legal counsel that is [sic] outside the scope of my license as a Marriage and Family Therapist to render an opinion as to [Plaintiff's] mental capacity to perform work related mental activities."  (AR 301.)

[7] It appears from a review of the medical record that Plaintiff did not receive treatment from Dr. McKee in 2013, despite Plaintiff's statement to the contrary.  The only evidence of contact between Plaintiff and Dr. McKee in the record in 2013 is Dr. McKee's telephone call to Plaintiff on February 15, 2013, as a follow-up to his VA Suicide Hotline calls.  During that conversation, Plaintiff related that he is "frustrated with his finances and that his Disability is about to be lowered," but that he is "feeling somewhat better emotionally as he now has a female roommate who [keeps] his house clean."  (AR 708.)  Dr. McKee noted that, "[d]ue to his finances, [Plaintiff] is unable to come to VA for psychiatric services, but goes to Kaiser as he has insurance there."  (AR 708.)  The Court's inquiry into Dr. McKee's treating history of Plaintiff is therefore limited to his treating notes from 2012 and before.

1    McKee actually endorsed.  A review of Dr. McKee's notes do not relevel any opinion as to the

2    impact of his PTSD symptoms on his ability to work; therefore, any error in failing to discuss  Dr.

3    McKee's notes in greater detail is harmless because it was inconsequential to the formulation of

4    Plaintiff's residual functional capacity assessment.[8]   *See Carmickle,* 533 F.3d at 1162; *Stout,* 454

5    F.3d at 1055.

6        Contrary to Plaintiff's contentions, review of the treating record shows that Plaintiff had

7    periods of *improvement* while under Dr. McKee's care.  (*See, e.g.*, AR 504-05 (Plaintiff in

8    "euthymic mood and related feeling 'good' . . . appeared open and engaged.  His thought

9    processes were coherent and future oriented."); 608 (Plaintiff continuing to "visit family and

10   friends, work on his truck, watch television, and now watching his diet as well."); 632 (Plaintiff

11   sounded "calm and forthcoming" and is "'keeping busy in spite of [the] pain of working on cars'

12   to distract himself from his thoughts."); 636 "[a]lthough he has experienced a relapse, Plaintiff

13   reported that generally he is 'doing much better' than before treatment," and that Plaintiff

14   "reports decreased drinking, fewer and less intense nightmares and increased ability to manage

15   his behavior."); 659 ("[Plaintiff] reports that out of group he is experiencing a reduction in his

16   PTSD symptoms, including a decrease in anger and reduced imbibing of alcohol.").   The record

17   therefore weighs against a finding that Plaintiff experienced "continuing deterioration and

18   exacerbation of PTSD symptoms" during his treatment by Dr. McKee.  The Court "must consider

19   the entire record as a whole, weighing both the evidence that supports and the evidence that

20   detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific

21   quantum of supporting evidence." *Lingenfelter*, 504 F.3d at 1035 (citation and internal quotation

22   marks omitted).

23       Finally, Plaintiff contends that ALJ should have fully credited Dr. Donald Myers' entire

24   report dated December 17, 2013, including his "diagnosis" of Chronic Pain Syndrome.  (Doc. 16,

25   p. 18.)  A review of the record demonstrates, however, that Dr. Myers does *not* offer Chronic

26   Pain Syndrome as a diagnosis.  (AR 764.)  In fact, the only diagnosis offered by Dr. Myers in the

27

28   [8] Moreover, to the extent that Plaintiff argues that his entire treating record supports a diagnosis of PTSD, the ALJ is already being asked to reconsider that diagnosis. *See supra*, pp. 28-32.

1    treatment report is his "impression" of "[b]uttock and deep radiating leg pain after surgery of

2    uncertain etiology."   (AR 764.)   Chronic Pain Syndrome is only mentioned as part of the

3    treatment "plan" that Plaintiff "begin lumbar stretching exercises" and "[c]onsider other pain

4    control options."   (AR 764.)   In his decision, the ALJ properly credited these treatment plan

5    recommendations by Dr. Myers, as well as the rest of his report, as "supported by and consistent

6    with other record evidence."   (AR 27.)   Moreover, even were the Court to construe Dr. Myers'

7    mention of Chronic Pain Syndrome in his treatment plan as a "diagnosis," this is not enough to

8    find the ALJ erred.   *See Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990) ("The mere

9    diagnosis of an impairment listed in 20 C.F.R. Appendix 1, Subpart P, § 4.12 is not sufficient to

10   sustain a finding of disability.").   Indeed, other than Dr. Myers' notation of Chronic Pain

11   Syndrome in Plaintiff's treatment plan (AR 764), and the inclusion of Chronic Pain Syndrome in

12   a "Problem List" in Plaintiff's October 17, 2012, treatment record from Kaiser Hospital (AR 22,

13   672), the medical record is devoid of any further mention of Chronic Pain Syndrome, much less

14   *any* evidence that it was offered as a medically determinable impairment imposing any functional

15   limitation upon Plaintiff's ability to work.   *See* 42 U.S.C. §§ 423(d)(3) (defining a "physical or

16   mental impairment" as one that "results from anatomical, physiological, or psychological

17   abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

18   techniques"); 1382c(a)(3)(D) (same).   *See also* SSR 96-4p, 1996 WL 374187, at *1-2[9] (noting

19   that "regardless of how many symptoms an individual alleges, or how genuine the individual's

20   complaints may appear to be, the existence of a medically determinable physical or mental

21   impairment cannot be established in the absence of objective medical abnormalities; i.e., medical

22   signs and laboratory findings").   Absent any evidence whatsoever supporting a medically

23   determinable Chronic Pain Syndrome impairment, the ALJ's evaluation of Dr. Meyer's opinion

24   was not improper.

25

26

---

27   [9] Social Security Rulings ("SSR") are final opinions and statements of policy by the Commissioner of Social
     Security, binding on all components of the Social Security Administration. 20 C.F.R. § 422.406(b)(1).  They are "to
28   be relied upon as precedent in determining cases where the facts are basically the same."   *Paulson v. Bowen*, 836
     F.2d 1249, 1252 n.2 (9th Cir. 1988).

**4.  Because the Medical Record Was Neither Inadequate Nor Ambiguous as to Plaintiff's Alleged Mental Impairments, the ALJ Did Not Have a Duty to Order Any Further Consultative Examination.**

The ALJ has a duty "to fully and fairly develop the record and to assure the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). The duty to develop the record, however, is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001); *see* 20 C.F.R. §§ 404.1512(e), 416.912(e) ("When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision."). Where the record itself establishes ambiguity or inadequacy, it is unnecessary for the ALJ to make a specific finding of "ambiguity" or "inadequacy" of the record to trigger this duty to inquire and further develop the record. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011).

Here, the ALJ did not find the record to be ambiguous or inadequate, and the ALJ's rejection of a diagnosis does not create a gap in the record where there remains substantial medical evidence sufficient to reach a disability determination. The only evidence to which Plaintiff points that arguably raises a question of whether the record is inadequate is Disability Determination Services Field Officer M. Kuncl's interview notes, wherein he observed that Plaintiff "may be severely disabled mentally but a [consultative examination] may be required to establish his [disability insurance benefits] and weed through his extraneous conversation." (AR 284.) Based on this single note, Plaintiff argues that the ALJ erred in not ordering a consultative examination. (Doc. 16, pp. 17-18.) Plaintiff ignores, however, that non-examining psychiatric physician Dr. Haroun analyzed the case and concluded, based on his review of Plaintiff's entire medical record, that no consultative examination was required. (AR 89.) Therefore, in the absence of any independent finding of ambiguity in the records and based on the expert opinion of the agency reviewing physician that no consultative examination was necessary, the ALJ had no duty to order one. *See, e.g., Thomas*, 278 F.3d at 957 ("[O]pinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent

with independent clinical findings or other evidence in the record."); *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995), as amended (Apr. 9, 1996) (same).

**B.      The ALJ's Consideration of the Lay Witnesses' Testimony**

**1.      Legal Standard**

Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he expressly determines to disregard such testimony and gives reasons germane to each witness for doing so. *Lewis*, 236 F.3d at 511; *Stout*, 454 F.3d at 1053; *see also* 20 C.F.R. § 416.913(d)(4).   In rejecting lay witness testimony, the ALJ need only provide "arguably germane reasons" for dismissing the testimony, even if she does "not clearly link [her] determination to those reasons." *Lewis*, 236 F.3d at 512. An ALJ may reject lay witness testimony if it is inconsistent with the record. *See, e.g., id.* at 511-12 (rejecting lay witness testimony conflicting with the plaintiff's testimony and the medical record);  *Bayliss v. Barhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (rejecting lay witness testimony conflicting with the medical record). The ALJ may "draw inferences logically flowing from the evidence." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).   Further, "[i]f the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012).

**2.      The ALJ's Evaluation of Plaintiff's Nephew's Lay Testimony is Not Sufficiently Specific to Allow the Court to Conclude He Rejected that Testimony on Permissible Grounds.**

Here, the ALJ rejected Plaintiff's nephew Jose Velez's testimony.  The Court is not tasked with substituting its discretion in the place of the ALJ. *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001); *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).   While deference is warranted where the "evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision," *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005), the Court is unable to determine any specific, germane reason for the ALJ's rejection of the testimony of Plaintiff's nephew Jose Velez.  The ALJ fails to point to any specific piece of "medical evidence" contradicting Mr. Velez's testimony, or any specific "inconsistency" between Mr. Velez's statement and the overall record.  (*See* AR 22.)  In the absence of germane reasons

for rejecting Mr. Velez's lay opinion, the Court is unable to conclude the ALJ did not arbitrarily discredit it.   On remand, the ALJ must reconsider Mr. Velez's statement and must identify sufficient evidence to adequately support his conclusion that Mr. Velez's lay testimony was unsupported by and inconsistent with the medical evidence or other testimony of record.   *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).

## VI. CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case is REMANDED to the ALJ for further proceedings consistent with this order.   The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Angel L. Gomez and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   __**June 7, 2016**__                                    _____/s/ *Sheila K. Oberto*_____

UNITED STATES MAGISTRATE JUDGE